Next case for argument is Northern Illinois v. Service Company v. Secretary of Labor, Mr. DeBruin. May it please the Court, the first issue is whether the Mine Safety and Health Administration had jurisdiction over the gas. May it please the Court, the first issue is whether the Mine Safety and Health Administration had jurisdiction over the gas. Your brief talks about jurisdiction. What does any of this have to do with jurisdiction? The Supreme Court has been clear in the last 20 years that there's a fundamental distinction between the merits and jurisdiction. Your argument looks like an argument about the merits. What does it have to do with jurisdiction? Well, I thought when we had the hearing it was about the merits, whether there was any proof that the gas cylinders were used in mining. And I thought that it was plain there was no jurisdiction. But now the Secretary is raising a jurisdictional issue and we're saying when you read the statute, all the subjects of things that are involved in mining are modified by the words used in or to be used in. Your position seems to be that if a claim is not proved, the Secretary doesn't prove what he says he's setting out to prove, that's a shortfall of jurisdiction. What I'm saying is that the Supreme Court of the United States has held repeatedly that that is not what jurisdiction means. Is there some decision of the Supreme Court or even of this court that you're relying on for a jurisdictional characterization? I don't think this matters for what it's worth. But we always worry about jurisdictional characterizations because if there's no jurisdiction, that means we have to act even if the parties don't raise the problem. That's one reason why the Supreme Court is very cautious about calling anything jurisdictional. Yes, Your Honor. I appreciate that, Your Honor. As I say, I thought it was a matter of proof, but what we get for the first time... So I take it that your answer to my question is no. I ask, is there some Supreme Court case or some Seventh Circuit case you're relying on to characterize this as jurisdictional? That's correct. The answer would be no. The answer is no. Yes. Okay. All right. So when we look... So the Secretary, for the first time on appeal, raises this issue that there's an ambiguity in the statute. When we look at what she says, she is saying now the word structures should be read to mean everything inside a building. And when you look at that, you can have things that are both used in mining and not used in mining. For example, you could have a bicycle that somebody rode to work that day. And if the inspector comes by and it's in the building, there's a case. If the bicycle is moved outside, there's not a case. So we think that the statute is plain, that the case was not proved. In the event the court finds there is some ambiguity, we believe that if there is to be any deference, it would be skidboard deference. But here, since it's raised for the first time on appeal, there's no thoroughness in the treatment of this. There's no consistency. It's never been raised before by the Secretary. So we don't think there should be any deference to the Secretary in this case. If I may move to the second issue. The second issue is whether Northern was given fair notice that the regulation about principal power switches should apply to it in the situation we have here, where we have a main breaker that controls the power to eight circuit breakers, which are down the line. The main breaker is thrown on and off every day by the foreman. And when you get to these circuit breakers, one of them doesn't have a sign on it that designates what machine it controls. The fact is that the machine that it did control had not been used in three or four years. But when you look, the issue is whether Northern had fair notice. When you look at the cases that we have from the administrative law judges, the judge that we had in this case said in another case that no meaning had been worked out in the case law as to what a principal power switch meant. There's no definition of principal power switch. I thought it was a switch that controlled more than one machine. That, to me, is the common sense reading of the regulation, principal power switches that controls units. So the impression that I got was, okay, what we have is we have the main circuit breaker over here. Push it up, the power's on. Push it down, the power's off. Then you walk down 15 feet, and you push the green button, and the machine goes on. So we thought, yeah, that's the principal power switch. When the inspector came, he didn't see this thing going up and down. He just saw these things, and he said, I'm going to call that a principal power switch. And we said, okay. So when we get in the testimony, and I'm asking him questions, I said, what's the difference between a principal power switch and a circuit breaker? He said, you get four electricians. You get four different answers on it. So it's the cases, they haven't arrived at a meaning. The inspector didn't really arrive at a meaning. And we're looking there and reading the thing and say, gee, this looks like the principal power switch. And then we get a citation. It did control the unit, right? The one that was unlabeled, that wasn't labeled, did control a unit. It did control the unit, that's correct. But, yes, that's correct. But the way the power flows is, if you throw the power on with the main switch, then you still have to go down and push this. And I think the idea of the regulation is you have to identify how to shut that power off and put it on. And if you have a sign, that's good. Or if you can tell where it is by location, that's good, too. Well, the foreman does it every day. And it looks to me, in this case, the inspector just didn't see the power switch. So if the main switch is up, as in on, and then someone can't get to that and wants to turn the unit off, they can turn the unit off with the unlabeled button. Yeah, but that's not connected to a machine. And the foreman, he's the only one who goes in there every day. And this other machine wasn't operating, and a third-party contractor comes in if there's any problem with it. So I think the problem or the danger is very low, but I do think the evidence shows that we met the regulation. You know, getting back to the first issue, this is about the cylinder that it might fall over and the gas would push the cylinder. I don't think it would actually turn it into a missile, but that's the way they talk about it. So what is your view of that? My view of that is that it's – well, of course, the evidence is that it wasn't used in mining. It's there. Could it be dangerous? There are a number of things in one of these places that could be dangerous. We can go back and forth on that. And this is an odd fact. I'll concede that, that you have these gas cylinders, and it looked like somebody had used them and forgot to put the bungee cord back on. That's an odd fact. But I'm – So is your argument just it isn't mining-related? It's not – Or is it that the danger is too remote to worry about? No, it's not mining-related. I think if you get over into the area where you're talking about is it dangerous or not dangerous, then we can go back and forth forever on that. So that's all I have, Your Honors. Okay. Well, thank you. Thank you, Mr. DeVry. Ms. Blair-Kazuski? Good morning, Your Honors. May it please the Court, first to talk about the cylinders. Your Honor, the Secretary's position is that those cylinders were, in fact, used in mining. The standard says it was in a shop that was considered part of the mine. And because of that, everything in that mine is certainly suspect. The cylinders aren't in the category of an item, if you may, of something that would cause one to pause. For example, if you were to walk into this shop and saw probably a side of beef or something, you would say, this doesn't belong here. These cylinders belong in the mine. As a matter of fact, the transcript says that there was an engineer at that company, a mine employee, that used cylinders, used these exact gas cylinders. We didn't prove at the trial that these exact two were used, but they do use gas cylinders at this operation for cutting and welding. They're claiming that they had no idea how they got there. And I don't understand how that could be said. So I think this is part of a mine. It's incredible to think that Congress would give power to an agency to regulate a structure, the floors, the walls, the ceilings, and not the things that are inside of it. That seems unlikely. I would submit that the things inside of this mine, regardless of how remote they may seem, opposing counsel used a bicycle. If that bicycle were there and it's regulated, we would say that MSHA has jurisdiction over it. Counsel said on those cylinders, when they were used, the cylinders were taken outside the facility and used somewhere else. And so that somehow gets them off the hook. Your Honor, that's not the facts in this case. What they said, it was that the person at the mine who uses gas cylinders has it on his truck. And so those couldn't be there. Those couldn't be his. They also intimated in a sort of a tangential way that older people came onto the property. It was never proven why or what for. And I guess it was to sort of convince us that, okay, old people are there, so in case they need gas for whatever reason, they're there. But, Your Honor, this is this company's property, and everything there should be accounted for. If these cylinders didn't belong there, I certainly understand that. They should have moved them away. But if there is no, in the transcript, we tried to get them to say, if not MSHA, which agency would have jurisdiction over this? Waratosha? The answer was no. So if not the MSHA inspectors, whose job it is to police and inspect these mines in order to keep miners safe? Who would do it if not MSHA inspectors? But I found it odd, the suggestion that if the cylinder falls over and the cap falls out and the gas sprays out, that somehow this would convert the cylinder into a missile. The cylinder is very massive. It's over four feet tall. And this has happened before. Not at this mine, but were it to fall over, it has a protective cap on it. And that's why we found low negligence, because the ground on which it stood was pretty – it was not at all – it was smooth. And so if that cylinder, which we found out subsequently – as a matter of fact, an employee of the company who was tasked with walking around with the inspector was the one who checked. Our inspector, when he saw those two cylinders initially, he thought that perhaps they might have been empty. And when they checked it, they were full. If they were to fall over, very unlikely, there may have been items on top that could knock them over for whatever reason if they were to fall over. And those caps, those protective coverings were – Fell off. Fell off. That's – the people who know told us that that power, when it falls over, it's like a balloon that's full of air. If you let it go, it sort of goes berserk. And that's supposedly what this do. And I would imagine these are hundreds of pounds the cylinders were. So any miner going into that, it would be fantastic to sort of assume that a miner or two would enter the building at the exact time that it's going off. But it's plausible. So whomever went in there, whether it's a miner or the other equipment that's in there would be damaged. So are there actual data on how far the cylinder might be moved? In the balloon analogy, if it's a few inches, it's pretty harmless. If it's 20 feet or something, it could be very destructive. I am unaware of that. But indeed, in this particular case, it was parked, physically parked. Excuse me. The two cylinders were parked between big machines. So at the very least, those machines were in danger of being harmed. Okay. Okay. Thanks. Thank you very much. Thank you, Your Honors. Mr. Blair-Kazuski. Mr. DeBruyne, do you have anything further? Just a few seconds. I'll just point out the record will show that we did use gas, but those gas are contained on trucks. We're an excavation and demolition contractor also, and these trucks run around. That's where we have the tanks that we actually use. And I would just point out in the Secretary's brief at page 14, she says the fact that cylinders were not specifically shown to be used in mining, I think that confirms what the record shows. There's no proof that these were used in the mining. But isn't there an ambiguity to the concept of used in mining? I don't think that means necessarily that you have to be underground and so on. If the cylinder really could damage machinery that's used in mining, wouldn't you say that that cylinder was involved in mining, was part of the mining enterprise, something you need? I don't think so, Your Honor. I've had cases where we've had a car parked, I think it was in the same facility, and there's dust on the car, and it's got chocks on the wheel, and the battery is pulled out, and we got a citation because the parking brake wasn't set. And we didn't argue jurisdiction or anything like that. We said, yeah, it had been used one time to run around. We got one guy drove his car down in the mine to turn the machines on in the morning, and he drove it back out, and the horn didn't work. We got a citation. We didn't argue about that. So you do have some close cases, but in this situation, there was no evidence that these cylinders had anything to do with mining. If something had fallen off and they could have hurt something, and you get to your ambiguity about used in, I think we still fall short of that. Interesting question, though.  Okay, well, thank you very much, Counselor. Thank you.